## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

        Plaintiff,

    v.                            **Case No. 08-CR-17**

DORA MCGEE,

        Defendant.

## RECOMMENDATIONS AND ORDER REGARDING THE DEFENDANT'S PRETRIAL MOTIONS

On January 3, 2008, the grand jury returned a five count indictment alleging in counts one through four that Dora McGee ("McGee") violated Title 18, United States Code, Section 1341, when she made materially false statements and representations to the Social Security Administration ("SSA") to obtain replacement checks to which she was not entitled; and in count five that she knowingly and willfully made a false statement and representation of material fact to the SSA for its use in determining rights to benefits, in violation of Title 42, United States Code, Section 1383a(a)(2).

On February 7, 2008, the defendant filed the following motions: a motion to dismiss the indictment on the basis that the undisputed extrinsic evidence establishes as a matter of law the defense of entrapment by estoppel, and that the government is unable to prove that she acted with the requisite intent; a motion to dismiss the indictment pursuant to Federal Rules of Criminal Procedure 7(c)(1); a motion to dismiss the indictment based upon pre-indictment delay; a motion to compel discovery related to a claim of selective prosecution; and a motion to suppress statements.

The government has responded to the defendant's motions and the defendant has replied. A final pretrial conference is scheduled for March 18, 2008, and a jury trial is scheduled to commence on March 24, 2008, before the Honorable J.P. Stadtmueller.

**MOTION TO COMPEL DISCOVERY: SELECTIVE PROSECUTION**

The defendant alleges that she was prosecuted because of her race and thus seeks discovery to substantiate her claim. Because selective prosecution is not a defense to the merits of a charge, discovery is not obtainable pursuant to Federal Rule of Criminal Procedure 16(a)(1)(C), but rather is available only by way of an order of the court. United States v. Armstrong, 517 U.S. 456, 462-63 (1996). To prevail on a selective prosecution claim, the defendant must present clear evidence that the "the federal prosecutorial policy 'had a discriminatory effect and that it was motivated by a discriminatory purpose.'" Id. at 465 (quoting Wayte v. United States, 470 U.S. 598, 608 (1985)). In order to obtain discovery necessary to prove her claim, a defendant must produce some evidence tending to show the existence of both of the elements essential to a claim. "Although the some evidence standard is rigorous, it is still relatively light, because obviously, a defendant need not prove his case in order to justify discovery on an issue." United States v. Thorpe, 471 F.3d 652, 657 (6th Cir. 2006) (internal citations and quotation marks omitted).

**Discriminatory Effect**

The present prosecution is part of a larger investigation into persons engaged in similar "double check negotiation" involving recipients of Social Security benefits. The defendant was charged along with 21 other persons (all in separate indictments) in federal court, whereas 61 persons were charged in state court. See John Diedrich, *83 Charged with Fraud*, Milwaukee Journal Sentinel, Jan. 9, 2008, available at http://www.jsonline.com/story/index.aspx?id=705537. The defendant points out that she, along with the 21 other defendants charged in federal court, are all black. Based upon the defendant's investigation, all of the defendants charged in state court are also

black. Further, the defendant points out that the three counties targeted for enforcement were Racine, Kenosha, and Milwaukee counties, the counties in the Eastern District that have the highest proportion of black residents. Based upon its own review of published statistics, the court notes that Milwaukee, Racine, and Kenosha counties are the counties in the Eastern District with the largest black populations. See U.S. Census Bureau, Census 2000 Redistricting Data (Public Law 94-171) Summary File, Matrices PL1 and PL2, Wisconsin – County, GCT-PL. Race and Hispanic or Latino: 2000. Finally, the prosecution does not challenge the defendant's assertion that all defendants currently facing state or federal criminal charges as part of this recent crack-down for crimes related to double check negotiation are black.

While such statistical evidence raises concerns, by itself, it is insufficient to demonstrate discriminatory effect. United States v. Bass, 536 U.S. 862, 864 (2002) (per curiam) ("[R]aw statistics regarding overall charges say nothing about charges brought against *similarly situated defendants.*" (emphasis in original)). Nevertheless, the defendant argues that this statistical showing that all of the defendants charged are black is sufficient to demonstrate discriminatory effect.

The United States Supreme Court, see Armstrong, 517 U.S. at 470, and the Seventh Circuit Court of Appeals, see United States v. Hayes, 236 F.3d 891, 896 (7th Cir. 2001), disagree with the defendant. The Supreme Court found it inappropriate to simply presume that members of all races commit all types of crimes. Armstrong, 517 U.S. at 467-70. With respect to the discriminatory effect element, the defendant must make "a credible showing of different treatment of similarly situated persons." Id. at 470. Thus, absent evidence that a similarly situated person who happened to be a race other than black was not charged, the defendant cannot present sufficient evidence of the discriminatory effect prong so as to be entitled to discovery on her selective prosecution claim.

The defendant submits that proof of a similarly situated person was not charged is precisely why she needs discovery; absent court-ordered discovery, proof of a similarly situated individual

who was not prosecuted is an insurmountable and thus unreasonable evidentiary obstacle. Certainly, court-ordered discovery will make it easier for the defendant to identify a similarly situated individual who was not charged, if such a person exists. However, the defendant is not entitled to discovery absent this preliminary showing. "Merely demonstrating that better evidence cannot be obtained without discovery does not suddenly render otherwise insufficient evidence sufficient." Thorpe, 471 F.3d at 659 (quoting United States v. Arenas-Ortiz, 339 F.3d 1066, 1071 (9th Cir. 2003)).

The Supreme Court was not unmindful of this seeming Catch-22 situation when it imposed this high standard upon defendants. The Court found that this high standard was necessary to establish an appropriate balance between the competing interests of providing defendants with legitimate claims the ability to proceed on the one hand, and preventing inappropriate judicial interference in the prosecutorial decisions of the executive branch by unnecessarily imposing burdensome discovery demands upon prosecutors, on the other. In the view of the Court, if a claim is well founded, it should not be unreasonable to expect that a defendant is capable of identifying a similarly situated individual of a different status who was not prosecuted. Id. at 470.

Because the defendant has failed to identify a similarly situated person of a race different from herself who was not prosecuted, the court must deny the defendant's motion for discovery. In the interest of completeness, the court shall turn briefly to the second element of the Court's Armstrong test.

**Discriminatory Intent**

For the purpose of satisfying the discriminatory-intent prong, what "some evidence" means is not entirely clear. The Supreme Court has not had occasion to directly consider the issue, because the Court in both Armstrong and Bass found that the defendant had failed as an initial matter to satisfy the discriminatory-effect prong.

Thorpe, 471 F.3d at 659.

The defendant argues that the demonstration of discriminatory effect is evidence of discriminatory intent. The court finds this *post hoc ergo propter hoc* argument to be insufficient. If such an argument was sufficient, the Supreme Court's clear two-pronged test would be reduced to a single element. Furthermore, the defendant in her motion even suggests certain non-discriminatory factors influencing a decision to prosecute, e.g. the amount of loss involved and the sufficiency of proof. In the absence of any evidence of discriminatory intent on the part of the prosecutorial decision makers in the defendant's case, the court must deny the defendant's request for discovery, and thus the defendant's failure to demonstrate this element represents an additional and alternative reason as to why this court shall deny the defendant's request for discovery relating to her selective prosecution claim.

**MOTION TO DISMISS: ENTRAPMENT BY ESTOPPEL / LACK OF INTENT**

"The entrapment by estoppel defense applies 'when, acting with actual or apparent authority, a government official affirmatively assures the defendant that certain conduct is legal and the defendant reasonably believes that official.'" United States v. Baker, 438 F.3d 749, 753 (7th Cir. 2006) (quoting United States v. Neville, 82 F.3d 750, 760 (7th Cir. 1996)); see also United States v. Jumah, 493 F.3d 868, 875 n.4 (7th Cir. 2007) (citing 53 Am. Jur. Proof of Facts 3d 249 Proof of Defense of Entrapment by Estoppel § 20 (1999)). "The defendant must actually rely upon the official's assurances in choosing his or her course of conduct, and such reliance must be reasonable in light of 'the identity of the agent, the point of law represented, and the substance of the misrepresentation.'" United States v. Fish, 388 F.3d 284, 286-287 (7th Cir. 2004), rev'd on other grounds, 125 S. Ct. 1678 (Mar. 21, 2005) (quoting Neville, 82 F.3d at 761). "Entrapment by estoppel, grounded in the Due Process Clause of the Fifth Amendment, is a defense that is rarely available." United States v. Howell, 37 F.3d 1197, 1204 (7th Cir. 1994). This affirmative defense presents a question that ordinarily can be resolved only by the jury and is available only when the

defendant produces "sufficient evidence from which a rational jury could infer that he was entrapped into committing the crime charged." Fish, 388 F.3d at 286 (citing United States v. Santiago-Godinez, 12 F.3d 722, 727 (7th Cir. 1993)).

The defendant contends not only that the defense is applicable in the present case, but that she has so clearly satisfied the elements of the defense that the court should hold, as a matter of law, that the government cannot prove the elements of the crimes charged in the indictment beyond a reasonable doubt. Thus, the court should dismiss the indictment. In support of this motion, she reviews her interaction with the Social Security Administration ("SSA"). Over the course of a number of years, the defendant admittedly requested and negotiated numerous replacement checks, negotiating these together with her original check, thus resulting in a double payment of benefits. According to the defendant, the SSA promptly recognized this double payment, and notified the defendant that it would deduct the "wrongfully-obtained money from future checks." This is what occurred on about 25 identical transactions from 1996 to 2003. From the defendant's perspective, as she contends in her motion, the SSA simply treated her actions as a "cash advance" on disability payments. As a result of this alleged SSA sanction, or participation in an interest free loan transaction, the government is now precluded or estopped from pursuing criminal charges.

Federal Rules of Criminal Procedure 12(b)(2) states, "A party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the general issue." "A motion to dismiss is not intended to be a 'summary trial of the evidence.'" United States v. Yasak, 884 F.2d 996, 1001 (7th Cir. 1989) (quoting United States v. Winer, 323 F. Supp. 604, 605 (E.D.Pa. 1971). Ordinarily, the viability of an entrapment defense is not amenable to pretrial resolution because such defenses generally require determinations of fact and credibility. United States v. Johnson, 32 F.3d 304, 307 (7th Cir. 1994). However, under certain limited circumstances, for example, when the undisputed facts demonstrate that the government is unable to prove an

essential element of the crime, dismissal of the indictment without a trial is appropriate. United States v. Levin, 973 F.2d 463, 470 (6th Cir. 1992).

In support of her position that pretrial dismissal of the indictment is warranted, the defendant points to the Levin case, wherein the Sixth Circuit affirmed the district court's pretrial dismissal with prejudice of 545 counts of a 560 count indictment; the remaining 15 counts were dismissed without prejudice. Id. Under the facts of the case, the Sixth Circuit held that the government could not prove that the defendants acted with the requisite intent when allegedly committing various crimes by making false statements regarding the sale of certain medical products. In particular, it was undisputed that the supervising government agency issued letters to the defendants explicitly condoning the conduct that formed the basis for the indictment. Id. at 464-65.

This court finds the Levin case readily distinguishable from the facts presented in this case. For the reasons to be discussed, the court concludes that pretrial dismissal of the indictment is inappropriate. In the Levin case, there was an affirmative statement by a government agency that the precise conduct that the government sought to prosecute was legal. Id.; see also Raley v. Ohio, 360 U.S. 423, 438-439 (1959).

In the present case, the defendant does not allege that there were any affirmative representations by any official that the conduct the defendant is accused of engaging in was permitted. (See Docket No. 10 at 7.) Rather, the defendant alleges that the SSA's *inaction* amounted to an affirmative sanctioning of the defendant's double check negotiating. Specifically, the defendant argues that by not prosecuting her for each of the instances where she obtained double payment, or even informing her that such conduct was illegal, such inaction on the part of SSA amounted to an affirmative representation of legality by a government official upon which she was entitled to rely.

Under the facts as presented by the defendant, the court finds that the government's inaction is not sufficient to establish the entrapment by estoppel defense or negate the intent element of the crime, as a matter of law, so as to permit dismissal of the indictment in the pretrial stage. The government is not required to prosecute every violation of the law of which it becomes aware. Likewise, simply because the government becomes aware of a crime, it is not required to inform the suspected offender that such conduct is illegal. Parenthetically, the court does not equate the phrase "wrongfully-obtained money," contained in the notices to the defendant, with a phrase such as "money obtained by illegal means." In other words, the defendant was not advised that her conduct constituted a crime.

On the other hand, neither was the defendant told her conduct was legal. The court disagrees with the argument raised by the defendant in her reply that the SSA's replacement check, together with a letter notifying the defendant that the overpayment would be deducted from future benefit checks constituted an affirmative representation of legality. Unlike the government agency in <u>Levin</u>, the defendant is unable to allege that any of these letters actually stated that the defendant's conduct was legal. At most, all the defendant can argue is that the "legality" of the defendant's conduct could be inferred by the absence of any reference to illegality.

The availability of the entrapment by estoppel affirmative defense in the present case shall depend upon the evidence adduced at trial, and the viability of this defense can be resolved only by the finder of fact. Accordingly, the court concludes that the ultimate question of whether the defendant acted with the requisite intent is one that should be resolved by the finder of fact at trial. Subsumed within this question, the finder of fact will also have to determine whether the defendant relied upon the government's inaction and whether such reliance was objectively reasonable. Therefore, the court shall recommend that the defendant's motion to dismiss the indictment based upon entrapment by estoppel be denied.

**MOTION TO DISMISS: PRE-INDICTMENT DELAY**

> Although a statute of limitations is the primary guarantee against prosecutorial delay, the due process clause also plays a limited role in protecting defendants against "oppressive delay." United States v. Lovasco, 431 U.S. 783, 789 (1977). To determine whether the due process clause requires the dismissal of an indictment on the basis of undue pre-indictment delay, a court must engage in a two-step inquiry: 1) the defendant must prove actual and substantial prejudice; and 2) the court must weigh the prejudice to the defendant against the reasons for the delay. United States v. Antonino, 830 F.2d 798, 804 (7th Cir. 1987). The mere passage of time in itself is not enough to show prejudice. United States v. Perry, 815 F.2d 1100, 1103 (7th Cir. 1987).

United States v. Nichols, 937 F.2d 1257, 1260 (7th Cir. 1991).

> [A] defendant must show "actual and substantial prejudice" to prevail on a claim of pre-indictment delay. United States v. Smith, [80] F.3d [1138], [1191] (7th Cir. 1996) (citing [United States v.] Canoy, 38 F.3d [893], 901 [(7th Cir. 1994)]). "It is not enough . . . to offer some suggestion of speculative harm; rather, the defendant must present concrete evidence showing material harm." United States v. Anagnostou, 974 F.2d 939, 941 (7th Cir. 1994). The defendant's "allegations of prejudice must be specific, concrete and supported by the evidence--vague, speculative, or conclusory allegations will not suffice." United States v. Fuesting, 845 F.2d 664, 669 (7th Cir. 1988).

Prewitt v. United States, 83 F.3d 812, 820 (7th Cir. 1996). Only upon a defendant making the requisite showing will "the burden shift[ ] to the government to demonstrate that the purpose of the delay was not to gain a tactical advantage over the defendant or for some other impermissible reason." United States v. Henderson, 337 F.3d 914, 920 (7th Cir. 2003) (internal quotation marks omitted). "The government's reasons are then balanced against the prejudice to a defendant to determine whether a due process violation occurred." Id. (citing United States v. Canoy, 38 F.3d 893, 902 (7th Cir. 1994)).

The defendant alleges that she has been prejudiced by the delay in prosecution, because as a result of the passage of time, she is no longer able to recall the specific facts that led to her allegedly request replacement checks from the SSA. The defendant concedes that vague allegations of a faded memory are insufficient to establish prejudice for the purposes of a due process violation. However, the defendant raises the apparently novel argument, for it is not supported by any citation,

Case 2:08-cr-00017-AEG   Filed 03/03/08   Page 9 of 23   Document 19

that a lower standard should apply in the present case in light of a defendant's Fifth Amendment right to testify on her own behalf. Specifically, the defendant contends that the pre-indictment delay has amounted to a denial of her right to testify regarding the element of intent because her memory as to her reason for requesting a replacement check has faded. She hypothesizes, for example, that she may have requested a replacement check because she did not timely receive her original check, so there was no intent to defraud. The defendant submits that the court should impose a basic "fairness test," especially when the government has sanctioned her conduct.

On the point of fading memory, the Seventh Circuit has observed,

> A claim of faded memory, the veracity of which can rarely be satisfactorily tested, can be plausibly asserted in almost any criminal case in which the defendant is not charged within a few weeks, at most, after the crime. The possibility or likelihood of faded memory has not, however, in itself, been viewed as prejudice that requires dismissal of an indictment . . . .

United States v. Cowsen, 530 F.2d 734, 736 (7th Cir. 1976).

The court finds no reason to depart from this well-established rule in the present case. The court is not persuaded that some type of lower, or more forgiving standard should apply when it is the defendant's own memory that has allegedly faded. As noted in Cowsen, id. at 736-37, in most any case where a particular state of mind is an element of the crime, the defendant's own recollection is likely to be the best evidence of this element, and thus any delay is likely to result in some degradation of that evidence. Under the circumstances presented in this case, the court finds no reason to conclude that the statute of limitations should not act as an appropriate safeguard against the defendant being untimely charged. Therefore, the court shall recommend that the defendant's motion to dismiss for pre-indictment delay be denied.

Case 2:08-cr-00017-AEG   Filed 03/03/08   Page 10 of 23   Document 19

**MOTION TO DISMISS: FEDERAL RULE OF CRIMINAL PROCEDURE 7(c)(1).**

The defendant argues that the mail fraud counts (counts 1-4) of the indictment are insufficient because they fail to allege that she had actually received the original check before she requested a second check. Specifically, she argues that an intent to defraud must be alleged, and that simply cashing the original and replacement checks cannot constitute mail fraud unless a person first receives the original check, requests a replacement, and then subsequently negotiates both the original and replacement checks. Although the defendant concedes that this conduct alleged in the indictment, i.e. cashing double checks, may constitute another federal crime, she argues it does not constitute mail fraud.

An indictment is sufficient if it provides a "plain, concise, and definite written statement of the essential facts constituting the offense charged . . . ." Fed. R. Crim. P. 7(c)(1).

> An indictment must include all of the essential elements of the crimes alleged therein, and each basis for conviction must be "clearly set out in the indictment." United States v. Miller, 471 U.S. 130, 136 (1985); United States v. Susanne Yoon, 128 F.3d 515, 521-22 (7th Cir. 1997). In reviewing the sufficiency of an indictment, a court should consider each "challenged count as a whole and should refrain from reading it in a hypertechnical manner." United States v. McNeese, 901 F.2d 585, 602 (7th Cir. 1990). The indictment must be "read to include facts which are necessarily implied" and "construed according to common sense." United States v. Blinder, 10 F.3d 1468, 1471 (9th Cir. 1993); Yoon, 128 F.3d at 521-22.

United States v. Palumbo Bros., 145 F.3d 850, 860 (7th Cir. 1998). At a minimum, the indictment must state all elements of the offense, provide sufficient notice to the defendant to permit her to prepare an adequate defense and be sufficiently specific to make a defendant aware of any double jeopardy problems. Hamling v. United States, 418 U.S. 87, 117 (1974); Yoon, 128 F.3d at 521-22; United States v. Sloan, 939 F.2d 499, 501 (7th Cir. 1991). Ordinarily, an indictment is sufficient if it sets forth the offense using the words of the statute itself provided "those words of themselves fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements

necessary to constitute the offence intended to be punished." <u>Hamling</u>, 418 U.S. at 117 (quoting

<u>United States v. Carll</u>, 105 U.S. 611, 612 (1882)).

The defendant is charged with violating 18 U.S.C. § 1341, which states in pertinent part:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses [or] representations, . . . for the purpose of executing such scheme or artifice or attempting so to do, . . . knowingly causes to be delivered by mail . . . any such matter or thing, shall be fined under this title or imprisoned not more than 20 years, or both.

The indictment largely tracks the language of the statute when it alleges that

> the defendant herein, knowingly devised a scheme to defraud the Social Security Administration, and to obtain money from the Social Security Administration by means of materially false and fraudulent pretenses and representations. . . . To effect her scheme, on at least 29 occasions, McGee reported to the Social Security Administration that she had not received the benefits check for one of the beneficiaries for whom she was the representative payee. Based upon the information received from McGee, the Social Security Administration would issue a replacement check and would send that replacement check via the United States Mail to McGee.

> McGee would cash both the original check and the replacement check causing her to receive double the benefits to which she and the beneficiaries were entitled.

(Docket No. 1 at 1-2.) The indictment continues and states with respect to counts one through four

that

> [o]n or about the following dates, for the purpose of executing the above described scheme, McGee made materially false statements and representations to the Social Security Administration, thereby cause the Social Security Administration to send McGee a replacement benefits check through the United States mail. At all times, McGee knew she was not entitled to the replacement check.

(Docket No. 1 at 2.)

Contrary to the defendant's position, in order to obtain a conviction for mail fraud, the

government is not required to prove that the defendant received the original benefit check prior to

requesting the replacement check. Regardless of when either check was received, the crime of mail

fraud in these circumstances occurs when a person with the intent to fraudulently obtain money to

-12-

which she is not entitled, uses false means, pretenses or representations that causes such money to be mailed to her. At trial, the government may be able to prove the falsehood of the defendant's means, pretenses or representations by establishing that the defendant received the original check prior to requesting the replacement check, but this is not the only way that the government may prove the element of falsity. For example, the government may prove that the defendant, with the knowledge or belief that she was going to receive her check, claimed non-receipt in order to obtain a second check.

"The defendant's constitutional right is to know the offense with which [s]he is charged, not to know the details of how it will be proved." United States v. Agostino, 132 F.3d 1183, 1191 (7th Cir. 1997) (quoting United States v. Kendall, 665 F.2d 126, 135 (7th Cir. 1981)). Because prior receipt of the original check is not an essential element of the crime, but merely one way the government may prove an element of the crime, the indictment adequately informs the defendant of the crime with which she is charged. The court finds the indictment sufficient under Fed. R. Crim. P. 7(c)(1), and therefore, the court shall recommend that the defendant's motion to dismiss be denied.

**MOTION TO SUPPRESS STATEMENTS**

In her motion, the defendant raised the following grounds for suppression: that she was in custody and subject to interrogation when she gave inculpatory statements to law enforcement, but was not advised of her rights pursuant to Miranda v. Arizona, 384 U.S. 436 (1966); that her statement was not voluntary; and that the statements she made to law enforcement are inadmissible pursuant to Federal Rule of Evidence 408 because the statements were made during compromise negotiations. The defendant requested an evidentiary hearing to resolve her motion to suppress. The court granted the defendant's request, and on February 26, 2008, the court conducted an evidentiary hearing. Prior to the hearing, the parties submitted a stipulation of facts.

-13-

Also prior to the taking of testimony, the defendant moved to withdraw her motion to suppress under <u>Miranda</u> on the basis of custody. Thus, the evidentiary hearing proceeded on the issue of voluntariness and the issue of suppression pursuant to Rule 408. Testifying on behalf of the government were Special Agent Michael Clemens and Inspector Faith Mondry. The defendant briefly testified on her own behalf. A summary of the evidence adduced at this hearing is set forth below.

**Evidentiary Hearing Summary**

**Social Security Administration Senior Special Agent Michael Clemens**

Senior Special Agent Michael Clemens ("Clemens") began his investigation by requesting information from the SSA to identify the most egregious offenders with respect to double check negotiation ("DCN") in the Eastern District. In this data, McGee was identified as repeatedly engaging in DCN.

In May of 2007, after unsuccessful attempts to contact McGee at her listed address, Clemens became concerned that McGee was not residing at her address of record. Thus, he was concerned whether she would receive any message left for her or appropriately receive her mail, including her benefits check. Therefore, on June 9, 2007, Clemens summonsed McGee to the Social Security Office on Fond Du Lac Avenue in Milwaukee. Clemens testified that he would have preferred to conduct the interview at her residence rather than at the Social Security Administration offices. Based upon a review of McGee's file, Clemens learned that McGee was at the Fond Du Lac Avenue office on numerous occasions and that McGee was receiving SSI because of "borderline intellectual disorders and affective disorders."

Exhibit A is a copy of the letter dated June 9, 2007, summonsing McGee to the office. According to Clemens, this letter, and a similar letter dated September 27, 2007, which was received as Exhibit B, are fairly routine, but often, some of the boilerplate provisions are changed to

Case 2:08-cr-00017-AEG   Filed 03/03/08   Page 14 of 23   Document 19

meet the requirements of a particular interview. These letters are sent whenever a DCN investigation reaches the stage of required personal contact with persons who are suspected of such activities. The letter indicates to the recipient that it is necessary to conduct a benefits review with the Beneficiary Review Team. Further, these letters state that if the recipient does not appear, benefits will be stopped. Clemens testified that the Beneficiary Review Team is a fictional creation of the SSA, necessary to enable the SSA to communicate with suspected DCN offenders without initially tipping them off as to the nature of their investigation. The letter was drafted to sound neutral and unassuming so as to make the meeting appear as if it was an average Social Security encounter.

Exhibit C is a sketch representing the floor plan of the Social Security Administration Office on Fond Du Lac Avenue. When McGee arrived at the office, she would have come into a public waiting room where she would have waited until Clemens came to the door of the Social Security Offices and called McGee's name. McGee was then directed into a private office. This office has one entrance door for the investigator and one for the recipient. Once in the room and during the interview, McGee and Clemens were on different sides of a desk which divided the room. The June 19, 2007, interview started at 10:37 AM.

Postal Inspector Faith Mondry ("Mondry") was also present at the interview. Clemens identified himself as "Mr. Clemens" and introduced Mondry as "Miss Mondry." He made the introductions in this manner because he wanted to keep a laid-back atmosphere and did not want to create any impression of custody.

Clemens "eased" into the interview and asked McGee if she had any recent problems receiving her mail or correspondence from the Social Security Administration. Clemens does not recall her response but it was not confrontational. Within the first minute or two, the conversation turned to DCN. Clemens asked McGee if she knew what DCN was. McGee explained that she did

know what it was. Clemens stated that he wanted to go through some photocopies of checks at this point, and McGee agreed. Clemens also showed McGee an Excel spreadsheet that Clemens had prepared that outlined the checks. Clemens' interview style is to smile a lot; he does not need to "get in someone's face." He prefers to ask open-ended questions so that he can "get a feel for" the person. McGee was given the opportunity to ask questions but Clemens does not recall McGee asking any questions.

Clemens discussed the possibility of criminal charges, but stated that his job was simply to identify the facts, leaving the decision to prosecute to either the District Attorney or the U.S. Attorney. Clemens never made any promises to McGee during this interview and did not discuss the possibility of any sort of compromise during the interview. According to Clemens, McGee was calm, cooperative, relaxed, repentant, apologetic, and did not appear afraid. Clemens had a firearm in a bag underneath the table but no firearm was ever displayed during the interview. Clemens stated he told McGee that the interview was voluntary and that she was free to leave at any time. Specifically, Clemens pointed to the door while indicating that she could leave.

As Clemens progressed to the sworn statement of the interview, he displayed Exhibit D to McGee. Exhibit D is a form prepared by Clemens in cooperation with the US Attorney's Office in the Eastern District and the Milwaukee County District Attorney's Office. The handwritten responses to the questions on the form were filled in by McGee, and signed by her. This entire interview on June 19, 2007, lasted 14 minutes.

Following this interview, Clemens became aware of 9 additional DCNs and thus on September 27, 2007 a second letter was sent to McGee. On October 2, 2007, a second interview was conducted at the SSA offices. Clemens was in the building, but did not participate in this interview.

**Postal Inspector Faith Mondry**

Mondry, who was present in court during Clemens' testimony, agreed that Clemens' testimony was accurate as regarding the June 19, 2007, interview in which she also participated. Mondry described McGee as very cooperative, friendly, pleasant to deal with, and conversational. McGee was almost laughing when she responded to the question of where she learned about DCN by stating that she learned about DCN from her mother and she kept doing it because she was "greedy." Her mother then told her to stop doing it because people were getting in trouble for it. Mondry did not have any concerns about McGee's cognitive abilities; she was apparently able to read and understand appropriately.

The October 2, 2007 interview occurred in the same area and in the same manner as the earlier interview. Mondry indicated to McGee that she had met with McGee at her last interview, and Mondry then introduced the other Postal Inspector who was conducting the interview with her. The conversation quickly turned to the additional instances of DCN. McGee's demeanor during this second interview was the same as that during her first interview. She was extremely cooperative and candid. McGee inquired as to what was going to happen and Mondry indicated that the matter was going to be referred to prosecutors. Mondry was armed during both interviews and according to her agency policy, the firearm was concealed.

McGee signed a second statement, received as Exhibit E, which is similar to Exhibit D. This statement was filled out by McGee, signed by her, and on this form she drew a "smiley face" following her statement, "I am very sorry for everything but I know what I did was wrong but I did it and I will pay for my actions thank you very much."

**Dora McGee**

McGee testified that she receives SSI for herself and her son and these benefits are her only income.

**Analysis**

    **Voluntariness**

    The defendant contends that the statement was not voluntary because it was a product of "financial duress." Specifically, the defendant argues that a reasonable person reading Exhibit A would believe that cooperation was required in order to continue to receive benefits. McGee was particularly susceptible to this coercion because Social Security benefits were her only source of income. Further, the defendant points to the deception contained in the letter to support her position that her statement was involuntary. Specifically, the SSA falsely conveyed the impression that McGee was undertaking a routine benefits review rather than a criminal investigation.

> "A confession is voluntary if, in the totality of circumstances, it is the 'product of a rational intellect and free will and not the result of physical abuse, psychological intimidation, or deceptive interrogation tactics that have overcome the defendant's free will.'" [United States] v. Huerta, 239 F.3d [865,] 871 [(7th Cir. 2001)] (quoting United States v. Dillon, 150 F.3d 754, 757 (7th Cir. 1998)). "Coercive police activity is a 'necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment.'" Id. (quoting Colorado v. Connelly, 479 U.S. 157, 167 (1986)).

United States v. Gillaum, 372 F.3d 848, 856-857 (7th Cir. 2004) Coercion is analyzed

> from the perspective of a reasonable person in the position of the suspect. See United States v. Brooks, 125 F.3d 484, 492 (7th Cir. 1997). Factors relevant to that determination are the defendant's age, education, intelligence level, and mental state; the length of the defendant's detention; the nature of the interrogations; the inclusion of advice about constitutional rights; and the use of physical punishment, including deprivation of food or sleep. See id. Narcotics, alcohol, and fatigue also may be considerations in a particular case. See id.

Huerta, 239 F.3d at 871.

    The first letter summoning McGee to the SSA office states in relevant part:

> This review is mandatory. You must attend the review in order for us to allow you to continue receiving Social Security or SSI benefits. If you fail to participate in the review we will stop your benefits until a Review is completed.

> We do not wish to interrupt payment any beneficiary that the Social Security Administration serves but this review is required to meet the requirement of Public Law 102-97. The review will take approximately 15-20 minutes.

-18-

Your cooperation in this matter is required in order to continue your benefits.

(Exhibit A.)

The second letter summoning McGee to the SSA offices for a follow-up interview states in relevant part:

> This review is mandatory. You must attend the review in order for us to allow you to continue to pay you SSI. If you fail to participate in the review, we will stop any benefits you are paid or paid as a Representative Payee. As a result benefits being currently paid to any beneficiary may be stopped indefinitely.
>
> We do not wish to interrupt payments to any beneficiary that the Social Security Administration serves but we must conduct this review in order to meet the requirements of Public Law 102-97. The review will take approximately 15-20 minutes.
>
> Bring this letter with you when you come to t6he [sic] office. If you cannot come in for you [sic] appointment, please call us at 414 297 3002.

(Exhibit B.)

Although both letters inform McGee that attendance at the scheduled meeting at the SSA office and participation in the review is required in order to continue benefits, the letters do not state, or even imply, that somehow, a confession to a crime is required to maintain benefits. Even by stating that "cooperation" is required, the first letter does not state or imply that cooperation means confessing to illegal actions. The record is clear that it was McGee's appearance at the meeting that was required; once she arrived at the meeting, she was told it was voluntary and that she was free to leave.

Admittedly, SSA engaged in deception in that the true purpose of the request to attend was made to seem like a routine administrative review, instead of a criminal investigation. However, the court doubts that transparency would bring recipients to the office; few people would accept an invitation to be criminally investigated. The deception that occurred in this case was of the benign variety that did not undermine the voluntariness of McGee's statement.

-19-

It could be argued that this deception caused McGee to not fully understand the potential for criminal consequences from her participation, but simply because a suspect did not fully understand the consequences of her statement does not undermine the voluntariness of that statement. Oregon v. Elstad, 470 U.S. 298, 316 (1985) ("This Court has never embraced the theory that a defendant's ignorance of the full consequences of his decisions vitiates their voluntariness."). Further, the evidence adduced at the evidentiary hearing makes clear that McGee was informed that this was a criminal investigation; the statements signed by McGee clearly state that she is making a statement to law enforcement and there was discussion that this matter would be referred to a prosecutor for a decision on criminal charges. Thus, in the view of this court, any deception that occurred was not the type of coerciveness that would overcome the free will of a reasonable person.

Turning to specific factors, the only factor that might indicate that McGee was uniquely susceptible to coercion is that fact that she was receiving disability for "borderline intellectual disorders and affective disorders." However, McGee was able to read, understand the investigators' questions, and respond to these questions appropriately. All other factors indicate that law enforcement conduct that occurred in this case would not have overcome the free will of a reasonable person in McGee's position. McGee was days shy of 32-years-old at the time of the first interview, appeared relaxed and conversational throughout both interviews, even going so far as to draw a smiley face following her apology in her second statement, the interview was very short, casual, and laid-back, and finally, there was absolutely no physical punishment. Therefore, it is the conclusion of this court that McGee's statements during both the June 19, 2007 and October 2, 2007 interviews were voluntary.

### Federal Rule of Evidence 408

Federal Rule of Evidence 408(a)(2) prohibits the use of conduct or statements made in compromise negotiations as evidence to prove a claim. However, this Rule does not apply when the

statement regarding compromise negotiations is "offered in a criminal case and the negotiations related to a claim by a public office or agency in the exercise of regulatory, investigative, or enforcement authority."

The following relevant arguments are contained in McGee's motion to suppress:

McGee believes Rule 408 mandates the exclusion from evidence of her alleged statements . . . on two (2) bases. First, the 2006 Amendment presupposes that statements or conduct during compromise negotiations with a a [sic] government regulatory, investigative or enforcement agency are admissible in a criminal case when a second agency is involved in the criminal prosecution, distinct from the agency involved in the civil process.

* * *

Second, and in the alternative, the Committee Notes to the 2006 Amendment make it clear that amendment distinguishes statements and conduct (such as a direct admission of fault) made in compromise negotiations of a civil claim by a government, from an offer or acceptance of a compromise of such a claim. An offer or acceptance of a compromise of any civil claim is excluded under the Rule if offered against the defendant as an admission of fault. The latter, which is what McGee alleged her alleged statement represents, is excluded under the Rule if offered against the defendant as an admission of fault. McGee's statements were not compromise negotiations. Rather, they were direct admissions of fault.

(Docket No. 10 at 29-30.)

Turning to the merits of the defendant's argument, the court finds no basis for exclusion pursuant to Rule 408. First, the defendant has failed to demonstrate that her statements were made as part of compromise negotiations. McGee's statements were made as part of a criminal investigation and thus do not fall within Rule 408. Second, even if the defendant could demonstrate that her statements were made as part of compromise negotiations, the exception set forth in Rule 408(a)(2) explicitly permits their admission. The court finds no support in the text of the Rule or the accompanying Notes of Advisory Committee on the 2006 amendments to support the conclusion that a statement to a government agent is admissible only if it is made to a different agency than the one conducting the criminal investigation. Rather, the Notes state, "Where an individual makes a

Case 2:08-cr-00017-AEG   Filed 03/03/08   Page 21 of 23   Document 19

statement in the presence of government agents, its subsequent admission in a criminal case should not be unexpected."

As for the defendant's second argument, the court finds that this argument fails because the defendant's statements were not made as part of a civil negotiation but rather as part of a criminal investigation. The fact that no negotiation occurred is conceded in the defendant's second argument and again during oral argument. There was no give-and-take but rather a simple admission of fault. Even if this court were to find that somehow the defendant's statements came within the purview of Rule 408, this would not exclude the defendant's admission of fault. Although the Notes make clear that the Advisory Committee did not intend the fact of a civil settlement to be translated into an admission of fault in a criminal matter, because such use might dissuade civil settlements, the Notes do not state or imply that an *actual* admission of fault could not be used as an admission of fault. This was not a case where the defendant accepted a proposed civil settlement simply as a means to put the matter behind her but rather made an explicit admission of fault.

Therefore, because the court finds that no settlement negotiation occurred to place the defendant's statements within the purview of Rule 408, the court shall recommend that the defendant's motion be denied.

**IT IS THEREFORE ORDERED** that the defendant's motion for discovery is **denied**.

**IT IS FURTHER RECOMMENDED** that the defendant's motion to dismiss the indictment on the basis of entrapment by estoppel be **denied**.

**IT IS FURTHER RECOMMENDED** that the defendant's motion to dismiss the indictment for pre-indictment delay be **denied**.

**IT IS FURTHER RECOMMENDED** that the defendant's motion to dismiss the indictment pursuant to Fed. R. Crim. P. 7(c)(1) be **denied**.

**IT IS FURTHER RECOMMENDED** that the defendant's motion to suppress statement be **denied**.

**IT IS FURTHER RECOMMENDED** that the defendant's motion to exclude her statement pursuant to Federal Rule of Evidence 408 be **denied**.

Your attention is directed to 28 U.S.C. § 636(b)(1)(B) and (C) and General Local Rule 72.3 (E.D. Wis.), whereby written objections to any recommendation herein or part thereof may be filed within ten days of service of this recommendation. Objections are to be filed in accordance with the Eastern District of Wisconsin's electronic case filing procedures. Courtesy paper copies of any objections shall be sent directly to the chambers of the district judge assigned to the case. Failure to file a timely objection with the district court shall result in a waiver of your right to appeal.

Dated at Milwaukee, Wisconsin this 3rd day of March, 2008.

s/AARON E. GOODSTEIN
U.S. Magistrate Judge